**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 25-1490**

---

In re: TOTAL AUTO FINANCING LLC,

Debtor.

--------------------------------------

ELSHAN BAYRAMOV; BABAK M. BAYRAMOV,

Plaintiffs – Appellants,

v.

AMERICAN CREDIT ACCEPTANCE, LLC,

Defendant – Appellee.

---

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Claude M. Hilton, Senior District Judge.  (1:24−cv−01746−CMH−WEF)

---

**No. 25-1501**

---

In re: TOTAL AUTO FINANCING LLC,

Debtor.

--------------------------------------

ELSHAN BAYRAMOV,

Plaintiff – Appellant,

v.

PERITUS PORTFOLIO SERVICES II, LLC; GARY PERDUE; STEVEN MEYER; BRITTNEY MUELLER; JOHN MCDERMOTT; MATTHEW PERDUE; SPARTAN FINANCIAL PARTNERS,

Defendants – Appellees.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Claude M. Hilton, Senior District Judge.  (1:24−cv−02071−CMH−WEF)

Argued:  January 29, 2026             Decided:  August 5, 2026

Before DIAZ, Chief Judge, and RICHARDSON and RUSHING, Circuit Judges.

Affirmed by published opinion.  Judge Richardson wrote the opinion, in which Chief Judge Diaz and Judge Rushing joined.

**ARGUED:**  James Thomas Bacon, MAHDAVI, BACON, HALFHILL & YOUNG, PLLC, Fairfax, Virginia, for Appellants.  Douglas Michael Foley, KAUFMAN & CANOLES, P.C., Richmond, Virginia, for Appellees.  **ON BRIEF:** Jeffery T. Martin, Jr., John E. Reid, MARTIN LAW GROUP, P.C., Vienna, Virginia, for Appellees Peritus Portfolio Services II LLC, and Gary Perdue.

2

RICHARDSON, Circuit Judge:

Not just anyone can bring a lawsuit. Our judicial system requires claims to be brought by the proper party. *See generally* William Baude & Samuel L. Bray, *Proper Parties, Proper Relief*, 137 Harv. L. Rev. 153 (2023). Article III's standing doctrine is the most familiar version of that requirement. But it's not the only one. When a business is injured, a related principle decides who may sue over the injury. The rule is simple to state: A stakeholder in a business—like a shareholder or member of an LLC—cannot personally bring a claim that belongs to the business. Courts often call this rule "standing" too. That label can be misunderstood. As we explain below, this rule—call it the claim-ownership principle—is not part of Article III's jurisdictional limit. It is a rule about the merits: who owns the claim.

In these two related cases, a business filed for bankruptcy after the value of its assets tanked. Its owners now bring, in their personal capacities, tort and contract claims against third parties that worked with the business. Because the complaints do not plausibly allege direct claims belonging to the owners, we affirm their dismissal.

## I.     BACKGROUND

Plaintiffs Elshan and Babak Bayramov own several Virginia businesses in the car-sales industry. One of those businesses, Total Auto Financing, LLC, provided loans to car buyers. Car loans can generate profit in two ways: The owner of the loans can either "service" the loans—by collecting monthly payments and repossessing any cars that are not paid off—or package and sell the loans. Over several years, Total Auto built a valuable

3

portfolio out of these loans.  But growing the portfolio was expensive, so Total Auto sought outside financing.

Total Auto eventually contracted with Defendant American Credit Acceptance, LLC.  Over the course of a few years, the two companies signed a series of credit agreements allowing Total Auto to borrow money from American Credit.  In each agreement, American Credit negotiated for two protections that matter here.  First, it took a first-priority security interest in Total Auto's loan portfolio.  Second, it required the Bayramovs (and several of their other businesses) to personally guarantee the debt.  This arrangement gave American Credit protection in case Total Auto could not repay the debt.  If things went south, American Credit would have the loan portfolio as collateral, and the Bayramovs would be personally required to cover any shortfall.

The parties signed their first credit agreement, worth $8 million, in 2021.  At the end of the agreement's one-year term, the parties renewed the agreement and increased the credit limit to $30 million.  But when it came time to renew the agreement again, American Credit offered only a 90-day extension.  And to protect its collateral, American Credit added a term requiring Total Auto to seek approval before selling any more of its loans.

Caught without a backup plan—and unable to pay off its $30 million debt—Total Auto was forced to sign the short-term credit extension with American Credit.  But because it was contractually barred from selling its loans to generate cash flow, Total Auto was in a cash crunch and eventually missed a debt payment.  At the end of the 90-day agreement,

4

Total Auto was unable to pay back the balance of the debt, and American Credit declared that Total Auto was in default.[1]

Once Total Auto defaulted, the relationship between the parties changed. American Credit terminated Total Auto's right to service its loan portfolio and selected a new company—Defendant Peritus Portfolio Services II, LLC—to begin servicing. This decision, the Bayramovs allege, was disastrous. The number of delinquent loans skyrocketed under Peritus's management, and Peritus failed to maintain the same revenue that Total Auto had generated from the portfolio. The decreased revenue further worsened Total Auto's cash-flow problems. Total Auto was forced to file for bankruptcy.

The bankruptcy court eventually appointed a bankruptcy trustee to represent the Total Auto estate. The trustee worked with Total Auto's creditors to develop a plan. In the end, the portfolio was sold at auction for $6.4 million—a fraction of the $47 million at which Total Auto had valued it. This was well short of the amount that Total Auto owed to American Credit, so the Bayramovs—as guarantors of the credit agreement—are on the hook for a substantial sum.

That brings us to these cases. The Bayramovs—in their personal capacities—filed two *pro se* complaints against Defendants. The complaints were filed as adversary proceedings within the federal bankruptcy case. *See* Fed. R. Bankr. P. 7001–87. Drawing

---

[1] Around this time, Defendant Spartan Financial Partners, a division of American Credit that worked with Total Auto throughout the credit relationship, offered to buy Total Auto's loan portfolio for $30 million—substantially less than the $47 million at which Total Auto valued it. Without the benefit of hindsight, Total Auto declined.

all reasonable inferences in the Bayramovs' favor, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), the two complaints allege a broad theory of wrongdoing against Defendants.

The Bayramovs allege that American Credit exerted substantial control over Total Auto's operations. American Credit required substantial financial disclosures, which allowed it to know what was happening behind the scenes at Total Auto. American Credit, according to the Bayramovs, knew the true value of the loan portfolio and sought to extract value out of the portfolio by buying it at a steep discount. To that end, American Credit lulled Total Auto into a false sense of security by giving the impression that it would renew the credit agreement. Then, right before the agreement expired, American Credit offered only a 90-day credit extension with onerous terms. Because Total Auto expected to extend the agreement under existing terms—despite no contractual right to extend—Total Auto had not secured other funding. So Total Auto agreed to the onerous contractual terms under financial duress.

One of those terms prohibited Total Auto from selling any of its loan portfolio without American Credit's consent. This limited Total Auto's ability to pay off its credit balance. Total Auto eventually defaulted, which triggered American Credit's right to service the contracts. The Bayramovs allege that American Credit's goal was to destroy the value of the portfolio. To do this, American Credit orchestrated a conspiracy to poorly service the portfolio. American Credit contracted with Peritus to tank the loan collections—whether by design or through negligent mismanagement. Once collections cratered, American Credit could acquire the portfolio at a discount—though a third party, not American Credit, ended up buying it. On the Bayramovs' theory, the final moves are

6

still to come: American Credit can buy the portfolio back from the third party, restore its performance, and pocket the recovered value—all while holding a judgment against the Bayramovs on their guaranties. On the flip side, the Bayramovs were doubly harmed by this scheme. Not only did their equity stake in Total Auto get wiped out when the business went under, but now they are left personally holding the bag as loan guarantors.

In one complaint, the Bayramovs sued American Credit, asserting causes of action to determine the "validity and extent" of American Credit's lien and to "quiet title." ACA J.A. 20.[2] They sought the entry of a judgment declaring that American Credit's lien was either "not valid" or would be paid out only after the Bayramovs recouped their equity investment. *Id.* They also asked for a judgment declaring that they were "the rightful owner[s]" of the portfolio "free and clear of any claims" by American Credit. ACA J.A. 20–21.

In the other complaint, Elshan Bayramov alone sued Peritus (the loan servicer), Spartan (the division of American Credit), and employees of each company. He asserted a host of tort and contract claims: breach of fiduciary duty, breach of the implied covenant of good faith and fair dealing, unjust enrichment, negligence, conspiracy to injure business, and tortious interference with business relationships.

The bankruptcy court dismissed both complaints. The court held that the Bayramovs lacked standing to bring any of their claims because the claims belonged to Total Auto as an entity. In the court's view, each claim arose out of conduct involving

---

[2] We refer to the joint appendices in cases 25-1490 and 25-1501 as "ACA J.A." and "Peritus J.A.," respectively.

Total Auto—as opposed to the Bayramovs in their personal capacities. So the bankruptcy court dismissed both complaints.[3] The district court summarily affirmed.

## II.    DISCUSSION

The bankruptcy court's orders dismissed both adversary proceedings in full, and the district court affirmed. We have jurisdiction under 28 U.S.C. § 158(d)(1). We review the judgment of a district court sitting in review of a bankruptcy court *de novo*, applying the same standards the district court applied: We review the bankruptcy court's legal conclusions *de novo* and its factual findings for clear error. *In re Merry-Go-Round Enters., Inc.*, 400 F.3d 219, 224 (4th Cir. 2005). Because these appeals turn on the legal sufficiency of the complaints, our review is *de novo* throughout.

Before analyzing whether the Bayramovs' claims survive a motion to dismiss, we address the claim-ownership principle and how it fits into the normal pleading standards. We then take up each of the Bayramovs' claims and conclude that each falls short.

### A.    Claim-Ownership Principle

A plaintiff generally cannot raise another person's claim. This idea—the claim-ownership principle—is often easy to apply. Consider a basic example involving three friends, Alice, Bob, and Carl. While the three are hanging out, an argument ensues and

---

[3] In its oral ruling, the bankruptcy court contemplated dismissing the claims against Peritus for lack of jurisdiction under Rule 12(b)(1). It is unclear whether that was the ultimate basis for the dismissal in either case. But, as we discuss below, claim-ownership standing is not a jurisdictional issue. So, to the extent the bankruptcy court dismissed either complaint under Rule 12(b)(1), it erred. But we may still affirm. *See Hawes v. Network Solutions, Inc.*, 337 F.3d 377, 383–84 (4th Cir. 2003) (affirming a Rule 12(b)(1) dismissal on an alternate Rule 12(b)(6) ground).

8

Alice punches Bob. Because Alice intentionally caused offensive contact with Bob, Bob can bring a battery claim against Alice. But can Carl, who wasn't battered? A court will quickly dismiss Carl's claim, because he will not be able to allege the elements of battery. Sure, he can establish that Alice committed a battery; but he can't establish that Alice battered *him*. This example illustrates the claim-ownership principle in its simplest form. But life is rarely so simple.

The lines can blur in more complex cases. For example, when a business entity is injured by a third party's tortious conduct, several different parties can be harmed. Consider a business that falls victim to a fraud scheme that empties its investment accounts. The business itself is harmed by the loss of money from its account. But several related parties may also be harmed by the fraud's downstream effects. For example, the business's owners will suffer a loss to their equity investment, some of its employees may lose their jobs to offset the loss, and its creditors may begin to miss debt payments. Sorting out who is allowed to sue the fraudster to recover for their loss can create problems.

Common-law courts around the country have created rules to figure out who owns a given claim. While there are some variations from state to state, several organizing principles have developed. For example, in the context of a corporate shareholder's right to bring a claim arising from an injury to the corporation, the general rule is that "shareholders cannot sue in their own names and on their own behalf to recover for a loss resulting from depreciation of the value of their stock as the result of an injury to the corporation." 12B William Meade Fletcher et al., *Fletcher Cyclopedia of the Law of Corps.* ("*Fletcher Cyclopedia*"), § 5913 (perm. ed., rev. vol. 2026).

9

So when an equity holder claims only harm to the value of his equity, he cannot normally bring a claim against a third party in his personal capacity. This rule seeks to avoid multiple recoveries for the same action; if a business and its owners could bring separate actions, defendants would be subject to countless lawsuits and double recoveries. The rule also gives a business's management the primary responsibility for seeking redress of its injuries. A direct action by a business is ordinarily the best way to redress the harm caused by a third party because it redresses the business—and, indirectly, its equity holders—in a single action.

But business leaders sometimes fail to act in the business's best interests. So over time, equity courts developed the derivative action—a mechanism for business owners to bring lawsuits on behalf of their businesses. *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 95 (1991). A derivative action is a "suit to enforce a *corporate* cause of action against officers, directors, and third parties." *Ross v. Bernhard*, 396 U.S. 531, 534 (1970) (emphasis added). So unlike a so-called "direct action" brought by an owner in his own right, a derivative suit is brought by an owner as a representative of the business. To ensure that this power is not abused, state courts (and legislatures) have developed rules of procedure to determine who can bring a derivative action—and how they can do so. For example, states generally require a business owner to make a demand on the business

10

before bringing the action. *See, e.g.*, Va. Code § 13.1-672.1(B)(1) (corporations); *id.* § 13.1-1042(B)(1) (LLCs).[4]

Deciding whether a plaintiff can bring a given claim is particularly important in corporate litigation. But there is nothing magical about the concept. Instead, it is a specific example of the broader claim-ownership principle. The ultimate question is the same: Whose claim is it? If it's the owner's claim, he can bring it directly. If it's the business's claim, the owner generally can bring it only if he satisfies the procedural requirements for bringing a derivative claim.[5]

Policing the line between direct and derivative actions is particularly important in the bankruptcy context, where several parties fight over a limited pool of assets. When a debtor is insolvent, equity holders are generally the last to be paid out. *See, e.g.*, 11 U.S.C. § 1129(b)(2) (explaining priority requirements for contested reorganization plans). Without the claim-ownership principle, an equity holder could recover damages from a third party for harm it caused to the bankrupt business. This would give the equity holder money that belonged in the debtor's pool of assets, thereby jumping the seniority line and harming creditors.

---

[4] Although derivative actions most often come up in the context of corporations, Virginia law allows derivative actions to be brought by the owners (called "members") of an LLC. *See generally* Va. Code § 13.1-1042. So, though most of the cases discuss "shareholders" and "corporations," the same principles apply to claims involving Total Auto, a Virginia LLC.

[5] In this case, the Bayramovs have not suggested that they have met the requirements to bring a derivative claim under Virginia law. *See, e.g.*, Va. Code § 13.1-1042 (requiring a written demand made on the LLC). Nor have they alleged facts to support such a finding. So if we conclude that the claims belong to Total Auto, we must affirm their dismissal.

11

One other unique feature of bankruptcy bears mentioning. When a bankruptcy petition is filed, a bankruptcy "estate" is created. 11 U.S.C. § 541(a). That estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." *Id.* § 541(a)(1). This includes legal claims. *See Nat'l Am. Ins. Co. v. Ruppert Landscaping Co.*, 187 F.3d 439, 441 (4th Cir. 1999). And in many cases, like this one, a trustee is appointed to manage the debtor's estate. In such cases, our Court has held that when "a cause of action is part of the estate of the bankrupt then the trustee alone" can bring the claim. *Id.* So bankruptcy heightens the claim-ownership inquiry: If the claim belongs to the debtor, it belongs to the estate, and the trustee—not an equity holder suing in his own name—controls it.

Given the importance of the distinction between derivative and direct actions, courts have developed guidelines to help distinguish them. The guidelines are not strict rules—which would be difficult to develop in such a fact-intensive area of law—but help courts determine who owns a given claim. We summarize several relevant guidelines below.

Virginia adopts the "overwhelming majority rule" that "an action for injuries to a corporation cannot be maintained by a shareholder on an individual basis and must be brought derivatively." *Simmons v. Miller*, 544 S.E.2d 666, 674 (Va. 2001).[6] Virginia

---

[6] The parties do not meaningfully engage with the choice-of-law questions here. Because these cases were brought in a federal bankruptcy court within Virginia, we apply Virginia's choice-of-law rules. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *In re Merritt Dredging Co.,* 839 F.2d 203, 206 (4th Cir. 1988) (applying *Klaxon* in bankruptcy court). And Virginia would likely apply its own substantive law regarding derivative actions: Total Auto is a Virginia LLC operating in Virginia, the Bayramovs are in Virginia, and the relevant conduct occurred primarily in Virginia. *See,* (Continued)

12

statutes recognize the fundamental principle that an LLC is an entity separate from its members. So an LLC's members are not personally liable to a third party "solely by reason of being a member." Va. Code § 13.1-1019. And the flipside is also true. A member cannot directly sue to recover for an LLC's injuries and, "solely by reason of being a member, is not a proper party to a proceeding by" an LLC. Va. Code § 13.1-1020.[7] So the benefit of an LLC—limited liability—comes with a corresponding burden limiting a member's ability to sue for the LLC's injuries.

Consistent with these statutory rules, Virginia courts have emphasized that "any claim regarding [an LLC's] assets must be pursued by, and in the name of, the LLC." *Erie Ins. Exch. v. EPC MD 15, LLC*, 822 S.E.2d 351, 356 (Va. 2019) (cleaned up) (quoting 10 William R. Waddell & Lee A. Handford, Virginia Practice Series: Business Entities § 1:15, at 29 (2018 ed.)). So a member of an LLC may not sue in his own right for an injury to the company on the theory that the injury depressed the value of his membership interest. *Remora Invs., LLC v. Orr*, 673 S.E.2d 845, 847–48 (Va. 2009); *see also Keepe v. Shell Oil Co.*, 260 S.E.2d 722, 724 (Va. 1979) (applying rule to a corporate stockholder); *Simmons*,

---

*e.g.*, *Milton v. IIT Rsch. Inst.*, 138 F.3d 519 (4th Cir. 1998) (discussing Virginia's choice-of-law rules). So we treat Virginia law as controlling.

That said, Virginia courts have not dealt extensively with the distinction between direct and derivative actions. And when they have addressed the issue, they have routinely referenced courts across the country and leading corporate-law treatises. *See, e.g.*, *Simmons*, 544 S.E.2d at 674 (citing various state courts and *Fletcher Cyclopedia*). So where Virginia has not expressed a specific rule, we consult general principles developed by common-law courts.

[7] The two statutory exceptions are for where the proceeding's "object is to enforce a member's right against or liability to" the LLC or when it's a derivative action. Va. Code § 13.1-1020.

13

544 S.E.2d at 673–75 (applying rule to a closely held corporation).  And a plaintiff cannot turn a derivative action into a direct one through artful pleading—courts look at substance, not labels.  *See Remora Invs.*, 673 S.E.2d at 846–48 (examining the substance of the injury in an alleged direct action and concluding that the injury was to the company); *Rivers v. Wachovia Corp.*, 665 F.3d 610, 613, 619 (4th Cir. 2011) (rejecting plaintiff's "varied attempts to recast his derivative claim as individual," noting his "effort to disguise a classic derivative claim" was "too clever by half"); *see also Fletcher Cyclopedia*, § 5912.

Virginia courts have not laid out a comprehensive test for determining whether a given claim is direct or derivative.  But other courts have developed tests to guide the analysis.  Some courts require an equity holder bringing a direct claim against a third party to show some "special duty" or "special injury" separating himself from other equity holders.  *See, e.g.*, *Rivers*, 665 F.3d at 616 (applying North Carolina law).  A special duty exists where the third-party wrongdoer violates a duty owed directly to the equity holder— as opposed to the corporation or all equity holders generally.  *Id.*  A special injury exists where an equity holder is uniquely injured—often in his ability to exercise his rights as an equity holder.  *Id.* at 618.

Other courts reject the "special duty" and "special injury" requirements, preferring simpler frameworks.  Delaware courts, for example, hold that the distinction between a direct and derivative claim "must turn solely on the following questions:  (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?"  *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031,

14

1033 (Del. 2004). When answering these questions, Delaware courts require that an equity holder's "injury must be independent of any alleged injury to the corporation" such that he can "prevail without showing an injury to the corporation." *Id.* at 1039. If not, his claim is derivative. Virginia has expressly reserved judgment on whether to adopt this test. *See Remora Invs.*, 673 S.E.2d at 848.

We need not predict the exact test that Virginia courts would apply. As discussed below, the Bayramovs' claims fail regardless of the formulation.

## B.    Claim Ownership Is Distinct From Article III Standing

Before turning to the merits of the Bayramovs' claims, we briefly address a misconception about the claim-ownership principle. The claim-ownership principle is often called a question of "standing." *See, e.g.*, *Remora Invs.*, 673 S.E.2d at 847; *Nat'l Am. Ins. Co.*, 187 F.3d at 441. In fact, that's the term the bankruptcy court and the parties used in this case. While not necessarily wrong, it is important to distinguish claim-ownership "standing" from Article III standing.

Article III's standing requirements are familiar. To have standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). This inquiry will often be met by a business owner who sues a third party for causing harm to the business he owns. After all, assuming the third party reduced the value of the owner's equity, the owner has suffered a "classic pocketbook injury." *See Tyler v.*

15

*Hennepin Cnty.*, 598 U.S. 631, 636 (2023).  And we have no doubt that the Bayramovs have Article III standing here.

Unlike Article III standing, claim-ownership "standing" is not a jurisdictional issue. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014); *Franchise Tax Bd. of Cal. v. Alcan Aluminium Ltd.*, 493 U.S. 331, 335–36 (1990); *Martineau v. Wier*, 934 F.3d 385, 391 n.3 (4th Cir. 2019).  When a plaintiff improperly seeks to bring a true derivative claim as a direct claim, it's a merits problem.  That plaintiff has no claim at all.  *See Lexmark*, 572 U.S. at 128 (identifying this issue as whether a plaintiff "has a cause of action" under the relevant law).  A court should therefore deal with that defect under the normal standards for dismissing meritless claims.  *See* Fed. R. Civ. P. 12(b)(6); Fed. R. Bankr. P. 7012(b).

## C.      Claims Against American Credit

We first consider—and quickly reject—the Bayramovs' claims against American Credit.  The Bayramovs seek declaratory judgments to determine the validity and extent of American Credit's lien and to quiet title to the loan portfolio.

Start with the quiet-title claim.  Under Virginia law,[8] an action to quiet title "is based on the premise that a person with good title to certain real or personal property should not be subjected to various future claims against that title."  *Maine v. Adams*, 672 S.E.2d 862,

---

[8] As discussed above, we apply Virginia law to this claim.  But the outcome would be the same under New York law—which controls the construction of the credit agreement, and so is the other choice-of-law candidate.  New York has essentially the same rules for who can bring a quiet-title claim.  *See Morales v. Rolon*, 210 N.Y.S.3d 417, 421 (N.Y. App. Div. 2024) (holding that a party can "assert a cause of action to quiet title only where he or she has an estate or interest in the property").

866 (Va. 2009). But Virginia courts are clear that a party "must plead that she has superior title over the adverse claimant." *Squire v. Va. Hous. Dev. Auth.*, 758 S.E.2d 55, 62 (Va. 2014). So to bring a quiet-title claim, a plaintiff must have some claim to title over the relevant property—here, the loan portfolio.

This requirement forecloses the Bayramovs' quiet-title claim. Although their complaint seeks a judgment declaring them "the rightful owners" of Total Auto's loan portfolio, the face of the complaint makes clear that the portfolio is owned by Total Auto— not the Bayramovs personally. To be sure, the Bayramovs allege that Total Auto's initial funding came from "corporations they owned." ACA J.A. 13. But that doesn't mean that the Bayramovs themselves (or their associated corporations) own Total Auto's assets. An investment in an LLC does not give the investor personal title to the LLC's property. *See* Va. Code § 13.1-1021 (explaining that an LLC owns property separate from its owners). Indeed, the Bayramovs conceded that they have no direct ownership interest in the Total Auto loan portfolio in a hearing before the bankruptcy court. *See* Peritus J.A. 123 ("Your Honor, I have no argument about who owns the portfolio. Total Auto Finance does own the portfolio."). Total Auto may have been able to bring a quiet-title claim. But, without any claim to the relevant property, the Bayramovs cannot do so directly.

Their second claim fares no better. The Bayramovs seek a "judicial determination of the validity, priority, and extent" of American Credit's lien on the loan portfolio. ACA J.A. 20. Although the details of the claim are somewhat fuzzy, the Bayramovs seek a declaration that American Credit's "lien extends only after" the Bayramovs' initial investment into Total Auto. *Id.* Charitably read, this claim effectively seeks equitable

17

subordination of American Credit's debt claim behind the Bayramovs' equity interest. Setting aside other problems, this claim fails because it misunderstands the available statutory remedy.[9]

Equitable subordination is governed by 11 U.S.C. § 510(c). Under that statute, a court may "subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest." *Id.* So a creditor's "claim" can be subordinated to other debt claims, or an equity holder's "interest" can be subordinated to other equity interests. *See* 11 U.S.C. § 501 (explaining that creditors hold "claims" while equity holders hold "interests"). The statute does not allow for debt claims to be subordinated to equity interests. *See In re C.R. Amusements, LLC*, 259 B.R. 523, 529 (Bankr. D.R.I. 2001). So the Bayramovs' second claim against American Credit also fails.[10]

### D.      Claims Against Peritus, Spartan, And Their Employees

We now consider the claims that Elshan Bayramov alone brought against Peritus, Spartan, and employees of each company: breach of fiduciary duty, breach of the implied

---

[9] To the extent the Bayramovs press their claim literally—asking us to declare the lien invalid—it too fails: A challenge to the validity of a lien on the estate's property would benefit Total Auto's estate, not the Bayramovs directly. So this claim is plainly derivative.

[10] The Bayramovs alternatively suggest that a court could recharacterize American Credit's loan as an equity investment. But they misunderstand this remedy, too. Recharacterization is not used to remedy inequitable conduct. Instead, it is used to comport with financial reality. *See In re: Dornier Aviation (N.A.), Inc.*, 453 F.3d 225, 232 (4th Cir. 2006) ("While a bankruptcy court's recharacterization decision rests on the *substance of the transaction* giving rise to the claimant's demand, its equitable subordination decision rests on its assessment of the *creditor's behavior*."). In this case, American Credit's credit agreement created a debt claim and not an equity interest.

18

covenant of good faith and fair dealing, unjust enrichment, negligence, conspiracy to injure business, and tortious interference with business relationships.

Start with Bayramov's claim for breach of fiduciary duty. He alleges that Defendants were fiduciaries that "owed a duty of loyalty and care to act *in the estate's best interests*." Peritus J.A. 30 (emphasis added). Defendants allegedly breached this duty by failing to properly manage the loan portfolio, which caused the value of the portfolio to tank. Although some Defendants may have been fiduciaries of Total Auto, the complaint alleges no facts establishing that Defendants owed a fiduciary duty to Bayramov personally. Indeed, Bayramov's complaint correctly identifies that any fiduciary duty was owed to Total Auto. Duties are relational. So, because one cannot sue for the breach of a duty he was not owed, Bayramov has no direct claim for breach of fiduciary duty.[11] *See Remora Invs.*, 673 S.E.2d at 849 (affirming dismissal of direct claims where fiduciary duty was not owed directly to member of LLC).

The same is true of Bayramov's claim for breach of the implied covenant of good faith and fair dealing. Bayramov again pleaded himself out of court by arguing that "Defendants did not act in good faith to protect *the estate's value*." Peritus J.A. 31 (emphasis added). Setting aside that this is a contract claim—and that Bayramov alleges no contract of his own with these Defendants (as opposed to American Credit)—he has no direct claim for breach.

---

[11] Defendants argue that New York law applies to this claim, because the credit agreement states that New York law applies to the construction of the transaction documents. We need not decide which law applies, because our conclusion would be the same under either state's law.

Next consider Bayramov's claim of unjust enrichment.  He claims that Peritus was "unjustly enriched" at his expense "by continuing to receive compensation" for servicing the loan portfolio.  Peritus J.A. 39.  But Bayramov does not allege that he paid Peritus for its services.  The payments came from Total Auto's estate.  Total Auto is the party directly harmed by any unjust payments to Peritus, so Bayramov has failed to allege a direct claim of unjust enrichment.

Bayramov's claim for negligence requires more thought.  He claims that Defendants acted negligently by selecting Peritus as the loan servicer and that Peritus acted negligently by failing to adequately service the portfolio.  This negligence injured Total Auto by reducing the value of the portfolio.  But it also injured Bayramov personally—both by reducing the value of his equity stake in Total Auto and by increasing his guaranty exposure.  The harm to his equity stake is not enough for a direct action.  That is the classic case for a derivative claim.  *See Keepe*, 260 S.E.2d at 724 ("[A] stockholder has no standing to sue in his own right for an injury to the corporation on the ground the injury caused a depreciation in the value of his stock.").

But Bayramov's injury in his role as guarantor of the credit agreement goes beyond that of an ordinary equity holder.  An equity holder's exposure is limited to the value of his investment; by signing the guaranty Bayramov risked more.  When Total Auto's portfolio collapsed, Bayramov did not just lose his equity, he became personally liable for the shortfall on the credit agreement.  Is that added exposure enough to make the claim his own?  Not here.

20

Here, the alleged wrongdoing is disconnected from the guaranty.  It concerns loan servicing—the core of Total Auto's business.  Bayramov's complaint does not claim that he was fraudulently induced to sign the guaranty, or that Defendants breached any contractual duty owed to him directly as a guarantor.  He claims that Defendants injured Total Auto and that the injury rolled downhill to him.  Bayramov's guaranty exposure exists only because—and only to the extent that—Total Auto's portfolio lost value.  A recovery by Total Auto would shrink that exposure in like measure, and a full recovery would erase it.  *See Mid-State Fertilizer Co. v. Exch. Nat'l Bank*, 877 F.2d 1333, 1335–36 (7th Cir. 1989).[12]  The remedy, like the injury, runs through the company.  The complaint therefore does not allege a *direct* negligence claim by Bayramov, and the bankruptcy court

---

[12] Numbers help illustrate the point.  Suppose that the loan portfolio was initially worth $40 million, Total Auto owed $30 million on its credit agreement, and that Defendants' negligence caused $15 million worth of harm to the portfolio.  Defendants' conduct would leave the portfolio worth $25 million, leaving the loan guarantors on the hook for the $5 million shortfall.  But if Total Auto successfully brought suit for the harm, the $15 million loss would be recovered, and the guarantors would no longer have exposure—just as before Defendants' alleged conduct.

The same would be true if the portfolio were initially worth only $20 million.  The harm would leave the portfolio worth $5 million, leaving the guarantors on the hook for $25 million.  But if Total Auto successfully brought suit for the harm, the $15 million loss would be recovered, and the guarantors would be on the hook for $10 million—just as before Defendants' alleged conduct.

The illustrations simplify but the point is this:  Defendants' alleged misconduct did not cause Bayramov any harm that was independent of the harm caused directly to Total Auto.  So a recovery by Total Auto for its direct injury would remedy any harm to the Bayramovs in their role as guarantors on the credit agreement.  *See Mid-State Fertilizer*, 877 F.2d at 1335 ("An award putting the $1 back in [the business's] treasury would restore the [guarantor-shareholder plaintiffs] to their former position.").

properly dismissed it.[13]  *See Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 348–49 (4th Cir. 2013) (holding that an individual's role as guarantor of a lease obligation did not transform an LLC's claim into a personal claim).

Bayramov's claim for tortious interference with business relationships fares no better.  To prove tortious interference under Virginia law, a plaintiff must show:  (1) a valid contractual relationship or business expectancy; (2) that the defendant had knowledge of the relationship or expectancy; (3) that the defendant intentionally interfered with, induced, or caused a breach or termination of the relationship or expectancy; and (4) that the defendant's interference caused damages.  *Rappahannock Pistol & Rifle Club, Inc. v. Bennett*, 546 S.E.2d 440, 443 (Va. 2001).  Bayramov's claim fails at the first element.  He alleges that Peritus's mismanagement harmed long-standing relationships with Total Auto's clients—including by stopping payments to Total Auto—and caused him personal reputational harm.

Bayramov has perhaps identified a valid business expectancy that Peritus harmed: contractual relationships with existing customers.  But the complaint makes clear that those relationships belong to Total Auto.  It describes relationships with *Total Auto's* clients that

---

[13] "Guarantors are contingent creditors."  *Mid-State Fertilizer*, 877 F.2d at 1335–36; *see also* Fed. R. Bankr. P. 3005 (contemplating claims brought by guarantors).  So a guarantor might argue that he is able to bring a derivative claim in his role as creditor. While some courts have recognized creditor-derivative claims, we have reserved the question.  *See In re Balt. Emerg. Servs. II, Corp.*, 432 F.3d 557, 562–63 (4th Cir. 2005). We need not decide whether such a claim is permitted, because Bayramov failed to plead the necessary elements of such a claim.  *See id*.  And, while one treatise has noted that a guarantor may sometimes bring a direct claim, that is so only where the wrongdoing is "closely connected" with the guaranty contract.  *Fletcher Cyclopedia*, § 5920.  Because the wrongdoing alleged here doesn't meet that standard, we need not address that theory either.

led to loss of trust in *Total Auto's* management.  It identifies no contractual relationship or business expectancy belonging to Bayramov personally.  The complaint therefore fails to state a direct tortious-interference claim.

Finally, Bayramov brings statutory and common-law claims alleging that Defendants conspired to injure him in his trade, business, or profession by intentionally mismanaging Total Auto's loan portfolio.  *See* Va. Code § 18.2-500.  These claims fail too.

Start with the statutory claim.  Virginia courts carefully distinguish between harm to personal interests and harm to business interests.  *See, e.g.*, *Andrews v. Ring*, 585 S.E.2d 780, 784 (Va. 2003) (holding that statutory conspiracy claims "apply to business and property interests, not to personal or employment interests"); *Buschi v. Kirven*, 775 F.2d 1240, 1259 (4th Cir. 1985) (holding that "injury to the professional reputation of the plaintiffs" is a personal right not protected by the statute); *Shirvinski v. U.S. Coast Guard*, 673 F.3d 308, 321 (4th Cir. 2012) (same).  The statutory conspiracy claim protects against harms to business interests only.  So the party to bring such a claim must be the party with the business interests.  An individual can bring such claims where that individual himself has business interests.  *See Davis v. Gardiner*, No. 0274-24-4, 2025 WL 375815, at *8–10 (Va. App. Feb. 4, 2025) (real estate agent's personal business).  But where a complaint makes clear that the relevant interests belong to a business, the business must bring the claim.  *Cf. Luckett v. Jennings*, 435 S.E.2d 400, 402 (Va. 1993) (suggesting that an individual plaintiff must show that he "has a business that is separate and distinct from" a related business entity).  As discussed above, none of the relevant business interests that Defendants allegedly conspired to injure belonged to Bayramov.

23

Bayramov's common-law claim fails too. "A common law conspiracy consists of two or more persons combined to accomplish, by some concerted action, some criminal or unlawful purpose or some lawful purpose by a criminal or unlawful means." *Com. Bus. Sys., Inc. v. Bellsouth Servs., Inc.*, 453 S.E.2d 261, 267 (Va. 1995). Unlike a statutory conspiracy claim, the common-law version is not limited to business interests. *See Shirvinski*, 673 F.3d at 320–21. Bayramov claims harm to his reputation and financial position in Total Auto. Reputational harm is the only harm for which he could conceivably bring a direct claim. Even if that could support a common-law conspiracy claim—a question we do not decide—the theory was not sufficiently pleaded.

Bayramov alleges repeatedly that he suffered reputational harm as a result of the collapse of Total Auto. But his complaint fails to provide any factual allegations supporting his claim. It never specifies who learned of the collapse, how that affected their perception of Bayramov, or how any reputational harm was separate from harm to Total Auto. Conclusory allegations are not enough. *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). So this claim was properly dismissed, too.

\*          \*          \*

The Bayramovs allege that Defendants' conduct cost them millions—first by wiping out their equity in Total Auto, then by leaving them liable on the guaranty. Those losses are real. But they are the downstream effects of harm done to Total Auto; they do not establish direct claims for the Bayramovs. Once Total Auto entered bankruptcy, any such claims became property of its estate, to be pursued by the trustee alone for the benefit of

24

all creditors.  *See Nat'l Am. Ins.*, 187 F.3d at 441.  The Bayramovs never asked the trustee

to act, never sought authority to act in her place, and never pleaded a direct claim of their

own.[14]  The judgments are

*AFFIRMED*.

---

[14] In their briefs on appeal, the Bayramovs requested leave to amend their complaints on remand.  But they neither provided a proposed complaint nor explained how they would remedy the existing defects.  We thus deny the request for leave to amend.  *See Willner v. Dimon*, 849 F.3d 93, 114 (4th Cir. 2017).